FILED

2017 Nov-10  PM 04:42
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| **CHRIS PROSCH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO.** |
| | ) | **7:16-cv-1494-LSC** |
| **SANTANDER CONSUMER USA,** | ) | |
| **INC.; ALLSTAR RECOVERY,** | ) | |
| **LLC; PATRICK K. WILLIS** | ) | |
| **COMPANY, INC. DBA** | ) | |
| **AMERICAN RECOVERY** | ) | |
| **SERVICES,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

S. Greg Burge (BUR010)
R. Frank Springfield (SPR024)
Rachel R. Friedman (FRI045)

BURR & FORMAN LLP
420 North 20th Street; Suite 3400
Birmingham, AL  35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100
gburge@burr.com
fspringf@burr.com
rfriedman@burr.com

Attorneys for Defendants
SANTANDER CONSUMER USA INC.,
ALLSTAR RECOVERY, LLC, AND
PATRICK K. WILLIS COMPANY D/B/A
AMERICAN RECOVERY SERVICES

Exhibit List

Exhibit A:   Deposition of Mark Mooney

Exhibit B:    Declaration of Mark Mooney

Exhibit C:   Declaration of Steven Schelk

Exhibit D:   Declaration of Paige Fox

Exhibit E:   Declaration of Cathy Vallejo

Exhibit F:   Declaration of Rosalynd Adetula

Exhibit G:   Deposition of Christopher Prosch

Exhibit H:   Deposition of Paige Fox

Exhibit I:   Deposition of Steven Schelk

Exhibit J:   Tuscaloosa Police Department Documents

Exhibit K:   Declaration of Amy Newlin

Exhibit L:   Declaration of Ben Stewart

Exhibit M:  Deposition of Tanya Johnson

Exhibit N:   Deposition of Brian Dozier

# Table of Contents

I. INTRODUCTION ...................................................................................1

II. STATEMENT OF UNDISPUTED RELEVANT MATERIAL FACTS .............3

III. STANDARD OF REVIEW ...............................................................19

IV. ARGUMENT.....................................................................................20

   A.   Plaintiff's Claims for Wantonness and Punitive Damages Fail as a Matter of Law Because Defendants Did Not Act with Conscious or Reckless Disregard of the Rights or Safety of Others..................................................20

      1.   Plaintiff's wantonness claim fails as a matter of law. .............................21

      2.   A mere coding mistake will not give rise to punitive damages. ..............28

      3.   Plaintiff is not entitled to punitive damages for conversion. ...................30

   B.   Plaintiff Cannot Recover Emotional Distress Damages for Negligence, Conversion, or for his FDCPA Claim. ........................................................31

      1.   Emotional distress damages are not recoverable for negligence because Plaintiff was not in the "zone of danger." ........................................................31

      2.   Plaintiff cannot recover emotional distress damages for conversion. .....32

      3.   Plaintiff cannot recover emotional distress damages under the FDCPA.33

V. CONCLUSION .................................................................................35

30476325 v3

COME NOW Defendants Santander Consumer USA Inc. ("SC"), Allstar Recovery, LLC ("Allstar"), and Patrick K. Willis Company, Inc. d/b/a American Recovery Services ("PKW") (collectively, "Defendants") and, pursuant to Federal Rule of Civil Procedure 56, respectfully move this Court for summary judgment as to Plaintiff Chris Prosch's ("Plaintiff") claims for wantonness, punitive damages, and emotional distress damages.[1] In support of their Motion, Defendants respectfully show the Court as follows:

## I. INTRODUCTION

This case arises from one employee's mistake in erroneously coding a car loan on SC's internal system, causing Plaintiff's vehicle to be repossessed when it should not have been. The mistake caused SC to process the loan as if it still held a lien on the vehicle, even though the vehicle and title had been released to an insurance company and subsequently purchased by Plaintiff, free and clear of any prior lien held by SC.  Once the error was discovered, however, Defendants took immediate steps to reverse the repossession and returned the vehicle to Plaintiff the same day Defendants were able to identify him.

---

[1] On November 1, 2017, this Court dismissed Plaintiff's claims for invasion of privacy, negligent training and hiring, reckless and wanton training and hiring, and violation of the U.C.C. (*See* Doc. 53.)

Defendants admit that SC's mistake caused Plaintiff to be deprived of his vehicle for fifty-one (51) days, and do not dispute their liability for the mistake.[2] However, SC's mistake does not entitle Plaintiff to a windfall.  Alabama law is clear that such inadvertent coding mistakes, unaccompanied by any recklessness or malice, as here, cannot support a finding of wantonness or punitive damages. There is no evidence in the record showing that Defendants were aware of the mistake at the time the repossession was ordered or that Defendants acted maliciously in any way.  Indeed, one SC employee made a coding error eight months before SC placed the account for repossession, and this error was relied on by the employee who ultimately assigned the account for repossession.

Once the error was discovered, Defendants immediately took steps to make sure the vehicle was not sold at auction and to return the vehicle to the rightful owner.  However, Defendants were unable to determine Plaintiff's identity because Alabama does not make vehicle registration or ownership records available to the public.  Once Defendants determined Plaintiff's identity, the vehicle was returned to him that very day.  Under these facts, Plaintiff's claims for wantonness and punitive damages cannot succeed.  Additionally, Plaintiff has not met his burden for recovering emotional distress damages for his negligence, conversion, and

---

[2] Indeed, Defendants have amended their Answers and stipulate to liability as to Plaintiff's negligence, conversion, and FDCPA claims.  However, Defendants have not stipulated to any damages award for these claims.  (*See* Docs. 32, 33, 34.)

FDCPA claims.   Accordingly, Defendants request the Court to grant them summary judgment on Plaintiff's claims for wantonness, punitive damages, and emotional distress damages.

## II. <u>STATEMENT OF UNDISPUTED RELEVANT MATERIAL FACTS</u>

1.     SC is an auto finance company, and its core business is the financing and servicing of auto loans.  (Deposition of Mark Mooney ("Mooney Dep."), attached hereto as Exhibit A, at 9:3-4, 10:7-13; Declaration of Mark Mooney ("Mooney Dec."), attached hereto as Exhibit B, ¶ 4.)

2.     PKW manages the outsourcing of repossession assignments for various financial institutions, including SC. (Declaration of Steven Schelk ("PKW Dec."), attached hereto as Exhibit C, ¶ 2.)  After a lender such as SC issues a repossession assignment to PKW, PKW then assigns the repossession to a local vendor to handle the actual repossession. (*Id.*)  PKW is also known as American Recovery Services or ARS.  (*Id.* ¶ 1.)

3.     Allstar is a recovery company that, as part of its business, not only handles repossessions, but also transports vehicles, remarkets vehicles, cuts keys for vehicles, and completes condition reports for repossession aggregators, creditors, and insurance companies.  (Declaration of Paige Fox ("Allstar Dec.") attached hereto as Exhibit D, at ¶ 4.)  Allstar handles repossessions in Alabama and five other states.  (*Id.* ¶ 4.)

4.      On September 30, 2008, SC d/b/a Drive Financial Services financed the purchase of a 2009 Kia Spectra with VIN ending in "98942" (the "Vehicle"). (*See* Mooney Dec. ¶ 5.) The Vehicle was purchased by a non-party to this case, with the initials "T.L.," referred to herein as the "Borrower." (*Id.*) The Borrower executed a retail installment contract that gave SC a security interest in the Vehicle and the right to repossess the Vehicle upon default (the "Loan").  (*Id.* & Ex. 1 thereto.)

5.      In March of 2015, the Vehicle was in a wreck and declared a total loss by Safeway Insurance Company of Alabama ("Safeway Insurance").  (*See* Mooney Dec. ¶ 6.)  Safeway Insurance paid SC insurance proceeds for the Vehicle. (*Id.* ¶ 7; Mooney Dep. 24:11-15.)  After receipt of the insurance proceeds, SC released the title to Safeway Insurance in July of 2015, removing SC's lien on the Vehicle. (Mooney Dep. 24:11-15; 25:7-10; 31:21-24.)

6.      The insurance proceeds did not pay off the entire Loan balance, resulting in a deficiency balance on the Borrower's Loan. (Mooney Dec. ¶ 8.)  Because the Borrower still owed the remaining balance, SC continued to attempt to collect the balance from her. (*Id.*)

7.      After receiving the insurance proceeds and releasing the title to Safeway Insurance in July of 2015, an SC Insurance Representative named Cathy Vallejo ("Vallejo") properly changed the status code on the account from "E," which stands for insurance, to "O," which stands for "open servicing," and causes the

4

account to be transferred from SC's insurance department and placed back in normal servicing operations and collections.    (Declaration of Cathy Vallejo ("Vallejo Dec."), attached hereto as Exhibit E, ¶¶ 7-8; Mooney Dep. 25:17-26:19, 54:24-25, 55:7-18 & Ex. 7 to Mooney Dep. at Bates 178.)    However, Vallejo inadvertently left the class code blank, rather than adding a class code to signify that the account was "noncollateralized," or no longer associated with a lien on the Vehicle. (Vallejo Dec. ¶ 9; Mooney Dep. 25:17-26:1; 52:19-21; 55:7-15.)

8.    As a result of the coding error, SC's computer system treated the account as if the deficiency was still secured by the Vehicle. (Mooney Dec. ¶ 13.)    If the noncollateral class code had been properly added to the account at this time, it would have kept the account from being assigned for repossession.    (Mooney Dep. 27:20-28:11, 53:20-22; Mooney Dec. ¶ 13; Declaration of Rosalynd Adetula ("Adetula Dec."), attached hereto as Exhibit F, ¶ 8.)

9.    It was part of Vallejo's job duties to update the account with the correct codes.    (Vallejo Dec. ¶¶ 4, 9; Mooney Dep. 56:1-5.)    Vallejo failed to comply with SC procedure by failing to add the "noncollateral" indicator on the account. (Vallejo Dec. ¶ 9; Mooney Dep. at 56:4-5.)

10.    Vallejo has worked at SC since October 13, 2014 and has never made a similar coding mistake that either she or SC is aware of.    (Vallejo Dec. ¶¶ 1, 10; Mooney Dec. ¶ 12.)

5

11.     SC did not have the capacity to review the accuracy of every status code or class code entry because thousands of these code updates were entered on a monthly basis, some systematically and some manually.  (Mooney Dep. at 28:20-29:1.)

12.     In January 2016, six months after the coding mistake, Plaintiff purchased the Vehicle from Birmingham Auto Auction in cash for $4,069.94 for his wife to drive. (Deposition of Christopher Prosch ("Prosch Dep."), attached hereto as Exhibit G, 20:11-18, 27:7-20.)   Plaintiff registered the Vehicle in Alabama. (Mooney Dep. at 32:5-8 & Ex. 4 thereto.)

13.     Following SC's release of the Vehicle's title, the Borrower failed to make payments on the deficiency balance, causing her Loan with SC to go into default. (Mooney Dec. ¶ 14.)

14.     Because the Loan's account did not have the noncollateral class code entered, SC's business rules automatically moved the Borrower's account to a list of accounts to be reviewed for repossession when the balance remained unpaid. (Mooney Dep. 27:23-28:11, 52:19-25; Mooney Dec. ¶ 15.)

15.     On March 21, 2016, an SC Vendor Manager by the name of Rosalynd Adetula reviewed the Borrower's account and assigned the Vehicle for repossession. (Mooney Dep. 51:13-52:14; Adetula Dec. ¶¶ 1, 7.) Adetula relied on

the account's erroneous coding to assume the deficiency balance was still secured by the Vehicle.  (Adetula Dec. ¶ 8.)

16.    Vendor Managers at SC are trained to look for indicators on an account, such as a positive payment from an insurance company, showing that SC may have released its lien and that repossession should not be ordered. (Adetula Dec. ¶ 4; Mooney Dep. 56:14-57:12.) Pursuant to her training, Adetula should have seen the insurance payment, which should have triggered her to review the account's notes and the account documentation, such as the letter of guarantee from Safeway Insurance, to see if it was a total loss transaction and whether SC's lien had been released.  (Mooney Dep. 56:14-57:7.)  At that point, Adetula should have rejected the repossession assignment and corrected the account's coding to prevent the account from being assigned to repossession in the future. (*Id.* 57:8-12.)

17.    By failing to see these indicators showing that SC had released its lien on the Vehicle, Adetula failed to comply with her training. (Mooney Dep. 59:6-8; Adetula Dec. ¶ 9.)

18.    Adetula joined SC in 2005. (Adetula Dec. ¶ 1.)  Neither she nor SC has a record of Adetula's ordering a repossession on an account where the title had been released to an insurance company aside from this instance. (Adetula Dec. ¶ 10; Mooney Dec. ¶ 17.)

7

19.     On a monthly basis, SC conducts random account reviews to evaluate the repossession assignment processes.  (Mooney Dep. 59:14-19.)  However, because SC services over 1,000,000 accounts, it is not practical for SC to conduct a physical review of every account assigned for repossession.  (*Id.*)

20.     On May 9, 2016, SC assigned the repossession for the Vehicle to PKW. (Mooney Dec. ¶ 19; Mooney Dep. 11:18-12:12.)

21.     On June 8, 2016, the Vehicle was located via a License Plate Recognition ("LPR") scan by a company called Plate Capture that scans license plates and notifies Allstar if a scanned plate matches a VIN that is up for repossession. (Allstar Dec. ¶ 6; Deposition of Paige Fox ("Allstar Dep."),[3] attached hereto as Exhibit H, 17:8-19:20; Mooney Dep. 19:6-13, 19:22-21:9.)  Allstar was notified of the hit and was provided the name of the company that had the open repossession order−here, PKW. (Allstar Dec. ¶ 6.)

22.     After PKW confirmed that the Vehicle was an active repossession assignment from SC, PKW issued a repossession order to Allstar to repossess the Vehicle. (Allstar Dec. ¶ 6; PKW Dec. ¶ 7.)

23.     It was not unusual that the Vehicle was found somewhere other than the Borrower's address because most repossessions occur at a place other than the

---

[3] Due to an apparent error, the court reporter titled the deposition of Paige Fox the "30(b)(6) Deposition of Corporate Representative of Defendant Patrick K. Willis Company, Inc." Paige Fox's deposition is the 30(b)(6) deposition of Allstar Recovery, LLC, not PKW.  *See* Ex. 1 to Allstar Dep.

8

debtor's address.  (Deposition of Steven Schelk ("PKW Dep."), attached hereto as Exhibit I, 28:4-8.)

24.     Chris Thames, an Allstar employee at the time, received the repossession order on behalf of Allstar. (Allstar Dec. ¶ 7.)  Thames repossessed Plaintiff's Vehicle at approximately 2:40 a.m. on June 8, 2016 and took it to Allstar's lot in Northport, Alabama and secured it. (*Id.*)

25.     Allstar has no record of Thames being involved in a lien-loss repossession aside from this case. (Allstar Dec. ¶ 8.)

26.     Fifteen minutes after the repossession, at approximately 2:55 a.m., Thames called the Tuscaloosa County Sheriff's Office to report the repossession in case anyone called to report the Vehicle as stolen. (Allstar Dec. ¶ 9.)  This is a required part of Allstar's repossession procedure.  (*Id.*)  Thames provided the year, make, model and VIN for the Vehicle to the Sheriff's Office. (*Id.*)

27.     The morning of June 8, 2016, pursuant to Allstar's routine repossession procedures, Allstar's lot attendant verified that the Vehicle had the same VIN as the VIN on the repossession order from PKW and notified Allstar's home office that the Vehicle was ready to be either picked up by the customer or transported to be sold at auction. (Allstar Dec. ¶ 10.)

28.     Plaintiff was not present during the repossession and was not physically injured as a result of the repossession. (Prosch Dep. 30:9-31:10, 64:10-12.)

9

Plaintiff did not know that the Vehicle had been taken until he walked his wife to her car on the morning of June 8, 2016. (Prosch Dep. 30:9-31:10.)

29.     On June 8, 2016, Plaintiff filed a police report with the Tuscaloosa Police Department concerning his missing Vehicle.  (Prosch Dep. at 31:15-21; Tuscaloosa Police Department Documents, attached hereto as Exhibit J, Bates 000004.) Plaintiff also filed a claim with GEICO, with whom he had car insurance for the Vehicle.  (Prosch Dep. at 24:18-20, 36:13-15.)

30.     On June 11, 2016, SC discovered that it did not have a lien on the Vehicle. (Mooney Dep. 46:7-12.) David Soria, an employee in SC's Titles Department, was preparing to send the title to the auction for the sale of the Vehicle when he discovered that the title had been released to Safeway Insurance. (Mooney Dep. 46:10-47:1, 47:20-48:9; Ex. 7 to Mooney Dep. at Bates 157.) Soria noted in the account that the Vehicle should not be sold at auction and immediately placed the account on a "title problem hold." (Mooney Dec. ¶ 21.)

31.     Once SC discovered that it did not hold the title to the Vehicle, SC began investigating the error and how it could get the Vehicle back to the rightful owner. (Mooney Dec. ¶¶ 22-31.) SC verified that SC did not have a lien and attempted to verify the actual lienholder or owner in order to determine where to return the Vehicle.  (Mooney Dep. 47:20-48:9, 59:23-60:3, 61:22-62:2, 74:1-24.)

32.     SC's title employees have access to databases whereby they can verify the lienholder on a vehicle.  (Declaration of Amy Newlin ("Newlin Dec."), attached hereto as Exhibit K, ¶ 12.) Depending on the State, ownership information for a vehicle may be available as well. (*Id.*) However, SC does not have access to ownership information for vehicles registered in Alabama through Alabama's Department of Revenue websites or through any other database, and did not have such access in June or July of 2016.  (*Id.*; Mooney Dep. 60:4-18.)

33.     On June 16, 2016, David Soria emailed other SC employees asking them to review the repossession, stating that the Vehicle was a total loss and the title had been released to Safeway Insurance on July 13, 2015. (Mooney Dec. ¶ 23.)

34.     On June 17, 2016, Amy Newlin, a manager in SC's titles group, logged into and searched the Alabama Department of Revenue website in an attempt to identify the owner of the Vehicle, but Alabama's Department of Revenue database did not reveal ownership information.  (Newlin Dec. ¶ 8.) SC's other resources used for searching title or lien information also did not yield ownership information.  (*Id.* ¶ 9.) Newlin noted on the account, "AL issued 2/8/16 rebuilt title issued. No lien. Cannot verify owner name."  (*Id.* ¶ 7.)

35.     On June 21, 2016, Newlin emailed the Alabama Department of Revenue, requesting ownership information for the Vehicle. (Newlin Dec. ¶ 10.)   The

11

Department of Revenue responded, saying that the requested information could not be provided due to the "Federal Privacy Act." (*Id.*)

36.    On June 21, 2016, SC informed PKW that SC lacked a lien on the Vehicle and instructed PKW to hold the Vehicle at Allstar's lot until further notice. (Mooney Dec. ¶ 25.) PKW informed Allstar that the debtor listed on the repossession order was not the owner of the Vehicle and asked Allstar if anyone had contacted them about the Vehicle. (Allstar Dec. ¶ 12.) Allstar told PKW that the Vehicle had already been transported to the auction that morning, and that Allstar had no record of anyone contacting it regarding the Vehicle. (*Id.*)

37.    On June 21, 2016, Phillip Simonton, an SC Reinstatement Manager, instructed SC's remarketing department at SC, which manages the transportation and sale of collateral after repossession, to arrange for the Vehicle to be immediately transported back to Allstar's lot. (Mooney Dec. ¶¶ 22, 25.)

38.    On June 22, 2016, Michelle Basham, an Asset Remarketing Coordinator at SC, then placed a ten-year redemption hold on the Vehicle and asked ADESA Atlanta, the auction company, not to transport it. (Mooney Dec. ¶ 27.)  Basham asked ADESA Atlanta to issue a "take-back" to return the Vehicle to Allstar's lot. (*Id.* ¶ 28.)  ADESA Atlanta then informed SC that the Vehicle had been transported to ADESA Atlanta on June 21, 2016 and that the estimated time of arrival to bring it back to Allstar's lot was June 28, 2016. (*Id.*)

39.    On June 27, 2016, PKW requested a hold harmless document from SC to allow Allstar to accept the Vehicle back from the auction. (PKW Dec. ¶ 12.) PKW received the hold harmless document from SC that day and sent it to Allstar.  (*Id.*)

40.    On July 1, 2016, SC asked PKW for confirmation that the Vehicle had been returned to Allstar's lot.  (Mooney Dec. ¶ 30.)

41.    On July 6, 2016, Allstar informed PKW that the Vehicle had been returned to Allstar's lot. (PKW Dec. ¶ 14.) PKW authorized Allstar to sign the paperwork for receipt of the Vehicle and instructed Allstar that they were waiting for the address for where the Vehicle needed to be returned.  (*Id.*)

42.    On July 8, 2016, SC received the executed release from Allstar, indicating the Vehicle had been returned to Allstar from the auction. (Mooney Dec. ¶ 31.)

43.    SC had the address where the Vehicle had been repossessed and initially considered returning the Vehicle to the repossession site. (Mooney Dep. 71:1-4 & Ex. 12 thereto, Bates 46-48.)  However, SC's practice is to perform due diligence in order to ensure that it is returning a vehicle to the rightful owner, rather than simply dropping a vehicle off at the repossession site, which is often not the owner's address. (Mooney Dep. 75:5-20.)   Such practices are in place for loss prevention and risk avoidance purposes and are consistent with PKW's and Allstar's practices.  (Mooney Dep. 75:9-12; Allstar Dec. ¶ 15; PKW Dec. ¶ 18.)

30476325 v3

44.     Allstar also will not take a repossessed vehicle back to the repossession location without receiving appropriate documentation indicating who will be signing for the vehicle. (Allstar Dec. ¶ 15.)   Likewise, once the Vehicle was repossessed, PKW could not order the Vehicle to be released without a written authorization from SC in the form of a release instructing where, when and to whom to release the Vehicle.   (PKW Dec. ¶ 18.)     In this case, the necessary release authorizations could not be obtained until Defendants determined who owned the Vehicle so that they could return it to the rightful owner.  (Allstar Dec. ¶ 15; PKW Dec. ¶ 18.)

45.     On July 25, 2016, SC received a call from GEICO and was told that GEICO's insured, Plaintiff, had informed GEICO that his Vehicle had been stolen. (Mooney Dep. 76:19-22 & Ex. 7 to Mooney Dep., Bates 154; Ex. 1 to Declaration of Ben Stewart ("GEICO Dec."), attached hereto as Exhibit L, p. 8.)  However, SC could not immediately match Plaintiff to any account of SC's since the account associated with the Vehicle was under the Borrower's name, not Plaintiff's. (Mooney Dec. ¶ 32.)

46.     GEICO had located the Vehicle at ADESA Atlanta after running a valuation report on the Vehicle as part of their investigation of Plaintiff's claim. (Deposition of Tanya Johnson ("Johnson Dep."), attached hereto as Exhibit M, at 16:23, 17:1-18, 18:8-18, 19:7-23, 28:3-22.)   The Vehicle history on the valuation report

14

showed that the Vehicle was at an unidentified auto auction in Georgia as of June 23, 2016. (Deposition of Brian Dozier ("Dozier Dep."), attached hereto as Exhibit N, at 15:13-18, 17:2-23, 18:1-13 & Ex. 3 thereto at Bates 114; Prosch Dep. 36:13-23; Johnson Dep. at 20:2-5, 21:1-9, 28:3-22.)

47.    GEICO's investigator contacted ADESA Atlanta on July 25, 2016, who confirmed that the Vehicle had been at ADESA Atlanta but had been transported back to Northport, Alabama. (Johnson Dep. at 20:20-23, 21:1-9, 30:13-17; GEICO Dec. & Ex. 1 thereto, p. 8.)  ADESA Atlanta told GEICO's investigator that the Vehicle had been transported to Northport by PKW pursuant to orders from SC. (GEICO Dec. & Ex. 1 thereto at 8.)

48.    Soon thereafter, GEICO's investigator told Plaintiff that the Vehicle had been located and gave Plaintiff PKW's contact information. (Prosch Dep. 55:1-20; Johnson Dep. at 24:13-25:2, 31:5-9, 34:10-35:1.)

49.    On July 28, 2016, Plaintiff called PKW, and PKW gave SC's contact information to Plaintiff after he verified the VIN of the Vehicle. (Prosch Dep. 47:4-14; PKW Dec. ¶ 15.)  At 10:01 a.m. on July 28, 2016, Plaintiff called SC and said that he had purchased the Vehicle from an auction and that he had the title to the Vehicle. (Prosch Dep. 47:23-48:7; Mooney Dec. ¶ 33.) SC told Plaintiff that they would release the Vehicle to him that day. (Prosch Dep. 37:9-22, 47:4-16, 48:1-7.)

30476325 v3

50.     At 10:34 a.m. on July 28, 2016, SC sent release paperwork to PKW, authorizing the release of the Vehicle to Plaintiff.  (Mooney Dec. ¶ 34.)  PKW forwarded the paperwork to Allstar. (PKW Dec. ¶ 16.)

51.     Later that day on July 28, 2016, Plaintiff visited Allstar's Northport, Alabama lot to obtain his Vehicle.  (Prosch Dep. 37:19-22.) Plaintiff drove the Vehicle off Allstar's lot that day.  (Allstar Dec. ¶ 19.)

52.     All of the contents of Plaintiff's Vehicle and his personal property were in the Vehicle when it was returned to him, and the Vehicle was not damaged. (Prosch Dep. 42:8-18, 44:19-45:2.)

53.     After obtaining possession of their Vehicle, Plaintiff and his wife spoke with SC regarding compensation for the repossession.  (Mooney Dec. ¶¶ 40-44.) SC asked Plaintiff to submit documentation of any alleged damages, but Plaintiff never did.  (Prosch Dep. 51:19-52:11.)

54.     If neither Plaintiff nor GEICO had contacted Defendants, SC would have attempted to determine Plaintiff's identity through methods beyond its normal lien search databases, such as by using skip-tracing or a private investigator, if necessary, in order to return the Vehicle to Plaintiff.  (Mooney Dec. ¶ 38.)  SC would not have let the Vehicle sit on Allstar's lot forever and would not have sold the Vehicle.  (*Id.*)

16

55.    When SC ordered a full title history for the Vehicle from the Alabama Department of Revenue in connection with a bankruptcy hearing involving the Borrower, it took the Alabama Department of Revenue 37 days to provide a response.  (Newlin Dec. ¶¶ 13-14.)

56.    Neither Allstar nor PKW have a way to check the validity of a vehicle's lien in Alabama and, therefore, rely on lenders such as SC for this information.  (Allstar Dec. ¶ 20; PKW Dec. ¶¶ 19-20; PKW Dep. 46:17-23.)

57.    Allstar and PKW employees also do not have access to databases with vehicle ownership records in Alabama.  (Allstar Dec. ¶¶ 21-23; PKW Dec. ¶¶ 20-21.)

58.    Allstar does not have a policy regarding how to handle mistaken repossessions because it happens infrequently.  (Allstar Dec. ¶ 24.)  Allstar awaits instructions from its clients such as PKW on how to proceed.  (*Id.*)

59.    If the Vehicle had remained on Allstar's lot for 60 days, Allstar's general manager would have started making calls to PKW to figure out what to do with the Vehicle and how to return it to the rightful owner.  (Allstar Dep. 48:12-25; Allstar Dec. ¶ 25.)  However, Allstar has never had a vehicle remain on its lot for more than 60 days, and, therefore, had no formal policy in place to address this situation.  (Allstar Dec. ¶ 25.) Allstar would not have disposed of the Vehicle and has never disposed of a vehicle that it has repossessed.  (*Id.* ¶ 26.)

17

60.    No PKW employees or Allstar employees breached their respective company's procedures with respect to the handling of the repossession of the Vehicle.  (Allstar Dec. ¶ 28; PKW Dep. 55:11-14.)

61.    Plaintiff claims he experienced embarrassment as a result of the repossession because he told people his Vehicle was repossessed, though he also explained to them that he didn't owe money on the Vehicle and there must be a mistake. (Prosch Dep. 74:13-75:2, 76:3-18, 77:5-20.)  Plaintiff never asked anyone if they thought less of him because his Vehicle was taken.  (*Id.* 79:3-6.)  Plaintiff also claims he felt embarrassed by having to tell potential employers what happened to the Vehicle, though he did not actually apply for any jobs while his Vehicle was missing.  (*Id.* 79:13-22.)

62.    Plaintiff also claims he experienced anxiety and lost sleep as a result of thinking GEICO was going to deny his insurance claim if the car was not found. (*Id.* 81:21-82:2.)   However, Plaintiff, who has previously worked as an auto insurance adjuster, understands that insurance claims have to be investigated before they can be accepted, and was never told that the claim would be denied. (Prosch Dep. 82:11-22; Dozier Dep. 59:16-22.)

63.    Plaintiff also claims he had sleepless nights because he didn't know how he would get around, but he was able to borrow cars from family members at no charge and without issue.  (Prosch Dep. 61:8-17, 62:16-19.) Plaintiff claims that he

18

was "forced" to put his daughter's car seat in the front seat of a car he borrowed. (*Id.* 109:17-22.)  However, Plaintiff also owns a four-door Toyota Corolla, which has its own car seat and in fact was the car Plaintiff usually drove.  (*Id.* 27:17-28:4, 110:4-10.)

64.     Plaintiff was not employed at the time the Vehicle was repossessed and did not apply for employment while the Vehicle was missing.  (Prosch Dep. 10:9-18, 79:13-80:1.)

65.     Plaintiff did not seek any medical or psychological treatment as a result of the repossession.  (Prosch Dep. 86:7-87:14.)

## III. <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate if the pleadings, the discovery, and disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party is to point out the basis for the motion and the documents demonstrating the absence of a genuine fact dispute for trial.  *See, e.g.*, *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citations omitted).  To survive summary judgment, the nonmoving party bearing the ultimate burden of proof at trial must come forward with evidence sufficient to withstand a directed verdict motion.  *Id.*

## IV. <u>ARGUMENT</u>

A.    **<u>Plaintiff's Claims for Wantonness and Punitive Damages Fail as a Matter of Law Because Defendants Did Not Act with Conscious or Reckless Disregard of the Rights or Safety of Others.</u>**

Plaintiff's claim for punitive damages fails as a matter of law because he cannot meet the statutory standard necessary for recovering punitive damages for any of his claims. Under Alabama law, punitive damages may only be recovered in a tort action "where it is proven by **<u>clear and convincing evidence</u>** that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff."[4] Ala. Code § 6-11-20(a) (emphasis added).

There are no allegations of malice or fraudulent or oppressive conduct here. In order to recover punitive damages, therefore, Plaintiff must show that Defendants acted wantonly, or "with a reckless or conscious disregard of the rights or safety" of Plaintiff. Ala. Code. § 6-11-20(b)(3); *see also Cessna Aircraft Co. v. Trzcinski*, 682 So. 2d 17, 22 (Ala. 1996) ("Because Trzcinski failed to present clear and convincing evidence that Cessna was guilty of wanton misconduct, the circuit court erred in denying Cessna's motion for a J.N.O.V. on the issue of punitive damages."). Because there is no evidence of wantonness, and because there is no

---

[4] Plaintiff's only federal claim, asserted under the FDCPA, permits the recovery of statutory damages "not exceeding $1,000," but does not provide for punitive damages. *See* 15 U.S.C. § 1692k; *Brooks v. Caliber Home Loans, Inc.*, No. 8:17-cv-1247-T-27AEP, 2017 WL 2017 WL 3634606, at *2 (M.D. Fla. Aug. 22, 2017).

30476325 v3

basis on which to otherwise impose punitive damages, Plaintiff's claims for wantonness and punitive damages must fail.

### 1.    Plaintiff's wantonness claim fails as a matter of law.

Plaintiff's wantonness claim fails as a matter of law because Plaintiff cannot show that Defendants acted with conscious or reckless disregard for the safety of others. The Supreme Court of Alabama has defined wantonness as follows:

> Wantonness has been defined as the conscious doing of some act or the omission of some duty which under knowledge of existing conditions and while conscious that, from the doing of such act or the omission of such duty, injury will likely or probably result, **and before a party can be said to be guilty of wanton conduct it must be shown that with reckless indifference to the consequences he consciously and intentionally did some wrongful act or omitted some known duty which produced the result.**

*Roberts v. Brown*, 384 So. 2d 1047, 1048 (Ala. 1980) (emphasis added). Additionally, the "**most crucial element of wantonness is knowledge**, and while that element need not be shown by direct evidence it may be made to appear by showing circumstances from which the fact of knowledge is a legitimate inference, it may not be left to the conjecture or speculation of the jury." *Id.* (emphasis added) (citation omitted); *see also Rommell v. Auto. Racing Club of Am., Inc.*, 964 F.2d 1090, 1097 (11th Cir. 1992) ("The primary issue, of course, is knowledge— whether it may be said that [the defendant], under all of the existing circumstances, knew that its conduct would probably result in injury to others."). Indeed, "[t]o hold a defendant liable for wanton conduct in Alabama, a plaintiff must establish a

21

high degree of culpability." *Craft v. Triumph Logistics, Inc.*, 107 F. Supp. 3d 1218, 1220 (M.D. Ala. 2015); *see also Cessna Aircraft Co.*, 682 So. 2d at 19 ("While a party claiming wantonness does not have to prove an intent to injure, this Court has held that wantonness requires proof of some degree of conscious culpability.").

The distinction between negligent conduct and wanton conduct is of great importance:

> Negligence is usually characterized as an inattention, thoughtlessness, or heedlessness, a lack of due care; whereas wantonness is characterized as an act which cannot exist without a purpose or design, a conscious or intentional act.

*Ex parte Anderson*, 682 So. 2d 467, 470 (Ala. 1996) (citation omitted). Because it requires a "purpose or design," **wantonness cannot be based on an inadvertent mistake**. *See Newman v. Bankers Fid. Life Ins. Co.*, 628 So. 2d 439, 443 (Ala. 1993) ("Wantonness, which involves a conscious or intentional act, should not be confused with negligence, which involves inadvertence.").

Plaintiff's wantonness claim fails as a matter of law because Plaintiff is unable to show that Defendants intentionally acted with a reckless or conscious disregard for the rights of others, as opposed to acting due to mere inadvertence. *See Craft*, 107 F. Supp. 3d at 1221 (granting summary judgment on wantonness claim, noting, "mere inattention, *without something more that contributes to the accident,* that is, *without some exacerbating circumstance*," does not qualify as wantonness).   Simply put, a mistake was made when the class code was not

22

entered and when the account was assigned for repossession, and Defendants have admitted this mistake. Nonetheless, a mistake is not equivalent to wantonness. *See Barry v. Big M Transp., Inc.*, No. 1:16-cv-00167-JEO, 2017 WL 3980549, at *13 (N.D. Ala. Sept. 11, 2017) (dismissing wantonness claim because "inattention or carelessness does not constitute wantonness").

Although SC may have been negligent in its handling of Plaintiff's Vehicle, Defendants were not "wanton" as the term is defined under Alabama law. *See Cessna Aircraft*, 682 So. 2d at 22 (finding the plaintiff "failed to produce clear and convincing evidence that Cessna exhibited a conscious or reckless disregard of likely injury" as necessary for a finding of wantonness). The undisputed facts show that the repossession was the result of a mistake–an inadvertent coding error–not any intentional action made with conscious culpability.  (Vallejo Dec. ¶ 9.)  This coding error caused the account to be assigned for repossession, as it was relied on by another SC employee who failed to notice the insurance payment and lien release on the account. (Adetula Dec. ¶¶ 8-9.)  Indeed, but for the erroneous coding, the account would not have been added to the list of accounts to be reviewed for repossession in the first place.  (*Id.* ¶ 8; Mooney Dep. 28:4-11.)

There is no evidence in the record that any of the Defendants had any knowledge that the repossession would result in any injury to Plaintiff at the time it occurred.  It was not until three days after Plaintiff's Vehicle was repossessed that

23

any of the Defendants realized SC lacked title to Plaintiff's Vehicle, at which time SC began taking actions to immediately reverse the repossession and return the Vehicle to its owner. (Mooney Dep. 46:7-12, 47:20-48:9, 59:23-60:3, 61:22-62:2, 74:1-24, & Ex. 12 to Mooney Dep.; Mooney Dec. ¶¶ 21-31.)  Indeed, any company conscious of its wrongdoing would not immediately report its actions to the Sheriff, as Allstar did. (Allstar Dec. ¶ 9.)

 Once the error was discovered, SC took immediate action to halt the sale of the Vehicle, retrieve the Vehicle from the auction lot, and attempt to determine the owner of the Vehicle.  (Mooney Dec. ¶¶ 21-31; Newlin Dec. ¶¶ 7-10.)  Defendants purposely chose not to return the Vehicle to the repossession site before they could identify the rightful owner, in order to avoid further worsening the problem. (Mooney Dep. 75:9-12; Allstar Dec. ¶ 15; PKW Dec. ¶ 18.)  For example, if the Vehicle had simply been dropped at a random, unverified, location, a third party who was not the owner could have then obtained possession of, or damaged, the Vehicle. Instead, Defendants maintained possession of the Vehicle until they could verify whom it should be returned to. While this resulted in the Vehicle being out of Plaintiff's possession for fifty-one days, it also ensured that it was returned to the rightful owner. Such cautionary actions can hardly be described as taken in reckless disregard of the consequences.

24

SC exhausted its available resources in order to determine Plaintiff's identity. SC conducted a title search on June 17, 2016, but was unable to obtain ownership information for the Vehicle from any of its available resources, which included its subscription to Alabama's own Department of Revenue database, as well as two dealer databases. (Newlin Dec. ¶¶ 8-9.) In fact, SC does not (and did not during June and July of 2016) subscribe to any service that would enable it to determine the owner of a vehicle registered in Alabama. (*Id.* ¶ 12.) When its available resources proved fruitless, SC contacted the Alabama Department of Revenue directly in an attempt to obtain ownership information, but was denied the information due to privacy rules. (*Id.* ¶ 10.) Therefore, SC was not sitting back without making any attempt to return the Vehicle to Plaintiff, as Plaintiff will likely claim. Rather, SC was hamstrung by the fact that none of these sources could provide the name of the Vehicle's owner.

Moreover, when SC later ordered the full title history in September of 2016, the Alabama Department of Revenue did not even provide a response for ***37 days***. (Newlin Dec. ¶¶ 13-14.) Therefore, even if SC had ordered the full title history on June 21, 2016, it seemingly would have taken 37 days, or until July 28, 2016 to obtain a response. Therefore, SC would not have been able to return the Vehicle to Plaintiff before July 28, 2016, even if it had ordered the full title search.

Importantly, SC also would not have let the Vehicle sit on Allstar's lot forever.  (Mooney Dec. ¶ 38.)   If neither Plaintiff nor GEICO had contacted Defendants, SC would have attempted to determine Plaintiff's identity through methods beyond its normal lien search databases, such as through skip-tracing or hiring a private investigator, in order to return the Vehicle to Plaintiff.  (*Id*.)  For all of these reasons, SC did not act wantonly.

There is also not any evidence of wantonness on the part of either PKW or Allstar. PKW only issued the repossession order after its LPR dispatcher confirmed the Vehicle to be an active LPR assignment from SC, who it relies on for accurate lien information. (PKW Dec. ¶¶ 7, 19).   PKW does not have the capability to search ownership records of vehicles registered in Alabama.  (*Id.* ¶ 20.) Therefore, it had no way of returning the Vehicle to Plaintiff before Plaintiff contacted PKW.  When Plaintiff did contact PKW on July 28, 2017, PKW verified the VIN with Plaintiff and immediately gave him SC's contact information.  (*Id.* ¶ 15.)

Allstar also took care to ensure that it repossessed the correct car according to its records, by waiting for the repossession order from PKW before repossessing the Vehicle and checking the VIN again once the Vehicle arrived at Allstar's lot. (Allstar Dec. ¶¶ 6, 10.) Allstar also called the Sheriff's Office within fifteen minutes of the repossession, precisely to avoid a situation like this.  (Allstar Dec. ¶

26

9.)  Once the Vehicle was returned from the auction lot, Allstar awaited instruction from PKW, as Allstar lacked the ability to look up ownership information for vehicles registered in Alabama. (Allstar Dec. ¶¶ 20-21.)  Allstar would not drop off a vehicle at a random address without specific instructions on who would be accepting the vehicle.  (*Id.* ¶ 15.) If the Vehicle had still been sitting on Allstar's lot after 60 days, Allstar's general manager would have started making calls to PKW to figure out what to do with the Vehicle and how to return it to the proper party. (*Id.* ¶ 25.) Allstar has never had a vehicle remain on its lot for more than 60 days, and, therefore, has no formal policy in place to address this situation. (*Id.*) Allstar would not have disposed of the Vehicle and has never disposed of a vehicle that it has repossessed. (*Id.* ¶ 26.)

Both PKW and Allstar took reasonable precautions at every step.  All they could do was ensure they were repossessing the correct vehicle that had been assigned for repossession and immediately return the Vehicle to Plaintiff once he was identified, both of which they did. Once the error was discovered, they were reliant on SC for further instructions due to their inability to search ownership information. PKW and Allstar had no way of knowing whether or not SC had a valid lien or title, as they did not have access to SC's records or vehicle lien records in Alabama.  (PKW Dec. ¶¶ 19-20; Allstar Dec. ¶ 20.) Accordingly, neither PKW nor Allstar acted wantonly.

Viewing the facts in this case in the light most favorable to Plaintiff, there is simply no evidence that the subject repossession was conducted by any of the Defendants "with knowledge of danger, or with consciousness, that the doing [of the act would] likely result in injury." *Ex parte Anderson*, 682 So. 2d at 470 (alteration in original) (citation omitted). Accordingly, Plaintiff's claim for wantonness against all Defendants fails as a matter of law.

### 2. A mere coding mistake will not give rise to punitive damages.

Under Alabama law, a coding mistake, without more, cannot be the basis for punitive damages. *See Morgan Keegan & Co., Inc. v. Cunningham*, 918 So. 2d 897, 903 (Ala. 2005). In *Morgan Keegan*, the Supreme Court of Alabama held that the failure of two bank employees to properly document the plaintiffs' bank account could not be the basis for a punitive damages award, even though the mistake caused erroneous payments to the IRS and decreased the plaintiffs' investment by almost half. *Id.* at 903-04. The Court explained as follows:

> **It is axiomatic . . . that the mere failure of an agent or employee to follow a manual or procedures outlined by the employer will not authorize an award of punitive damages.** Were it otherwise, punitive damages might be awarded on the basis of simple negligence, contrary to well-established Alabama law.

*Id.* at 903 (emphasis added). The plaintiffs claimed that punitive damages should be awarded because the bank "failed miserably to conduct the most basic aspects of its business-to get a New Account Form signed," and this "*simple disobedience* to

the [bank's] Manual" caused their economic damage.  *Id.* (emphasis in original). The Court disagreed, stating that although such disobedience "arguably constitutes *substantial* evidence of *negligence*, [it] does not provide a basis for the punitive damages awarded in this case."  *Id.* at 903-04.

Like the plaintiff in *Morgan Keegan*, this litigation arises from an internal procedural mistake: failure to properly code the account after the title was released to Safeway, which led to the account being queued for repossession.  (Mooney Dep. 53:20-22, 27:23-28:11.)  As in *Morgan Keegan*, the internal mistake here does not warrant punitive damages, as "evidence of *negligence*[] does not provide a basis" for punitive damages. *Id.* at 904. Accordingly, Defendants are entitled to summary judgment on Plaintiff's punitive damages claim, as Plaintiff cannot show that Defendants acted wantonly, fraudulently, or oppressively.  *See Mid-State Homes, Inc. v. Holt*, 293 So. 2d 476, 483 (Ala. Civ. App. 1974) (dismissing claim for punitive damages when the defendant mortgage servicer's key punch operator made a mistake by crediting the plaintiff's account for amounts paid by another because the mistake was not known to defendant when it was made, the defendant took immediate steps to correct the mistake, and the mistake was "innocently and mistakenly made without an intent to injure and defraud").

30476325 v3

### 3.   Plaintiff is not entitled to punitive damages for conversion.

While Defendants admit that a conversion occurred, "[m]ere evidence of conversion itself is not enough to invoke the right to punitive damages." *Crabtree v. Ford Motor Credit Co.*, 413 So. 2d 1161, 1163 (Ala. Civ. App. 1982).  In cases where punitive damages have been awarded for conversion, the record contained evidence of abusive or intimidating conduct or a refusal by the defendant to return the property upon demand.  *See, e.g.*, *Indus. Techs., Inc. v. Jacobs Bank*, 872 So. 2d 819, 826, 832 (Ala. 2003) (punitive damages were properly awarded based on the defendant's "threats and intimidation" coupled with the defendant's refusal to return the equipment for four years despite demand for its return); *Russell-Vaughn Ford, Inc. v. Rouse*, 206 So. 2d 371 (Ala. 1968) (punitive damages were warranted when car dealership refused to return the plaintiff's car keys to him until the police showed up because "they just wanted to see him cry a while").

The undisputed record here contains no evidence of intimidation, abuse, insult, refusal to return property, or knowledge by Defendants at the time the taking occurred that the taking was in violation of the Plaintiff's rights. Rather, SC believed in good faith that it had the legal right to repossess Plaintiff's Vehicle because the account was in default and the account's coding led SC to believe that the Loan was still secured by the Vehicle. (Mooney Dep. 25:17-26:1; 28:4-11; Adetula Dec. ¶ 8.) Therefore, as it would normally do when a car loan was not

30

being paid by the borrower, SC repossessed the Vehicle. (Mooney Dep. 27:23-28:11, 52:19-25; Mooney Dec. ¶¶ 15-16.)

The only reason Defendants could not return the Vehicle to Plaintiff before July 28, 2016 was because they had no way to determine Plaintiff's identity. (Mooney Dep. 75:5-12; Mooney Dec. ¶ 39; Allstar Dec. ¶¶ 15, 21-23; PKW Dec. ¶ 18, 20.)  Once Plaintiff was identified as the owner, the Vehicle was returned to Plaintiff the very same day. (Prosch Dep. 37:9-22, 47:8-16.)   Defendants, therefore, kept the Vehicle in their possession only until they could confirm its rightful owner, at which time the Vehicle was immediately released.  (Mooney Dep. 74:25-75:20; Prosch Dep. 47:8-16.)  For all of these reasons, Defendants are entitled to summary judgment on Plaintiff's punitive damages claims.

### B.   Plaintiff Cannot Recover Emotional Distress Damages for Negligence, Conversion, or for his FDCPA Claim.

#### 1.   Emotional distress damages are not recoverable for negligence because Plaintiff was not in the "zone of danger."

Plaintiff cannot recover emotional distress damages for Defendants' alleged negligence because Plaintiff was not placed in the immediate risk of physical harm by Defendants' conduct.  "Alabama follows the 'zone-of-danger' test, which limits recovery of mental anguish damages 'to those plaintiffs who sustain a physical injury as a result of a defendant's negligent conduct, or who are placed in immediate risk of physical harm . . . .'" *Wal-Mart Stores, Inc. v. Bowers*, 752 So.

31

2d 1201, 1203 (Ala. 1999) (citation omitted)); *see also Reinhardt Motors, Inc. v. Boston*, 516 So. 2d 509, 511 (Ala. 1986) ("[T]he law will not allow recovery of damages for mental distress where the tort results in *mere* injury to property.").

Plaintiff was not physically injured by Defendants' negligence, and he was not placed in immediate risk of physical harm by the repossession. It is undisputed that Plaintiff did not suffer any physical injuries. (Prosch Dep. 64:10-12.) Plaintiff did not even know the Vehicle had been repossessed until later that morning. (Prosch Dep. 30:9-31:10.) Therefore, his claims for mental and emotional damages fail as a matter of law. *See Bowers*, 752 So. 2d at 1204; *see also Birmingham Coal & Coke Co. v. Johnson*, 10 So. 3d 993, 999-1000 (Ala. 2008).

### 2. Plaintiff cannot recover emotional distress damages for conversion.

"Ordinarily, in Alabama, a plaintiff cannot recover damages for mental anguish when a tort results in injury to property only, except when the tort is committed under circumstances of insult or contumely." *New Plan Realty Trust v. Morgan*, 792 So. 2d 351, 364 (Ala. 2000). Here, the record is devoid of any evidence or allegations of "insult or contumely" regarding the repossession. All of Plaintiff's conversations with Defendants were business-like conversations regarding the location of his Vehicle and compensation for the repossession. (Prosch Dep. 30:9-31:10, 47:6-48:18, 54:16-56:1, 105:7-23.) This is a far cry from the outrageous, offensive conduct found in other conversion cases. *Cf. Williford v.*

32

*Emerton*, 935 So. 2d 1150, 1155 (Ala. 2004) (plaintiffs were given ten minutes to remove all of their personal belongings from their home, resulting in the loss of multiple items of sentimental value, and lender threatened to call the police if they did not leave); *Morgan*, 792 So. 2d at 356-57 (defendant removed plaintiff's personal belongings from her apartment and told her to "get the fuck out of here" when she came and found her belongings missing). Accordingly, Plaintiff is not entitled to emotional distress damages for conversion.

### 3. Plaintiff cannot recover emotional distress damages under the FDCPA.

Because Plaintiff lacks a physical injury, and there is no evidence the repossession was intended to harm him, Plaintiff cannot recover emotional distress damages under the FDCPA.  Courts have held the FDCPA incorporates the applicable state law standard for proving intentional infliction of emotional distress.  *See Carrigan v. Central Adj. Bureau*, 502 F. Supp. 468, 470-71 (N.D. Ga. 1980); *Branco v. Credit Collection Services Inc.*, 2011 WL 3684503, at *10 (E.D. Cal. Aug. 23, 2011).  Accordingly, Plaintiff cannot recover emotional distress damages for his FDCPA claim.  *See Martin v. Hodges Chapel, LLC*, 89 So. 3d 756, 763 (Ala. Civ. App. 2011) (outrage claim must show that "the actor intended to inflict emotional distress").

Moreover, generalized evidence of stress, sleeplessness and worry is not sufficient to recover emotional distress damages under the FDCPA.  *See In re*

*Campbell*, 553 B.R. 448, 455 (Bankr. M.D. Ala. 2016) (evidence that plaintiff had been extremely worried and lost sleep as a result of defendant's actions, but had not seen a doctor or missed time from work, was insufficient to recover emotional distress damages); *Randolph v. Northeast Legal Group, LLC*, No. 2:12–CV–03800–RDP, 2014 WL 2740309 (N.D. Ala. June 16, 2014) (rejecting magistrate judge's report and recommendation to award emotional distress damages under the FDCPA where the plaintiff claimed she suffered embarrassment, stress and anxiety, holding that the "the present record does not support entry of such a damage judgment"); *Marchman v. Credit Solutions Corp.*, 2011 WL 1560647, at *10 (M.D. Fla. Apr. 5, 2011) (where the plaintiff "generally alleged that she had trouble sleeping, suffered anxiety and depression" but did not seek medical treatment, emotional distress damages not recoverable); *Montgomery v. Florida First Fin. Grp., Inc.*, No. 6:06-CV-1639ORL31KR, 2008 WL 3540374, at *9 (M.D. Fla. Aug. 12, 2008) (evidence that plaintiff suffered "temporary loss of appetite, sleeplessness and worry" was insufficient to recover emotional distress damages despite evidence that the defendant threatened to have plaintiff arrested six times and plaintiff struggled to sleep for fear she would be arrested).

Here, Plaintiff claims that he was embarrassed as a result of his Vehicle being repossessed, though he explained to third parties that he didn't owe money on the Vehicle and that he believed the Vehicle was stolen. (Prosch Dep. 76:3-18,

77:5-20.)   He claims he felt embarrassed with respect to contacting potential employers, though he never actually applied for employment while his Vehicle was missing.   (*Id.* 79:13-22.) He also claims he suffered anxiety because he thought his insurance claim was going to be denied, but he was never told the claim would be denied and understood that insurance companies have to investigate claims before approving them.   (*Id.* 82:11-22, Dozier Dep. 59:16-22.) He also did not have trouble borrowing cars from family members, and while he claims he had to put his daughter's car seat in the front seat, he owned another four-door vehicle that he could have used if he thought this was an issue.   (Prosch Dep. 62:20-22, 109:17-22, 110:4-10.) Finally, Plaintiff did not seek treatment from a doctor or therapist.   (*Id.* 86:7-87:14.) Under these facts, Plaintiff cannot recover emotional distress damages under the FDCPA.

## V. <u>CONCLUSION</u>

As shown herein, no genuine issue of disputed fact exists as to Plaintiff's claims for wantonness or punitive damages, or as to Plaintiff's claim for emotional distress damages.   Accordingly, Defendants respectfully request that the Court grant summary judgment in their favor on all of these claims.

30476325 v3

Respectfully submitted this 10th day of November, 2017.

> *s/ Rachel R. Friedman*
> S. Greg Burge (BUR010)
> R. Frank Springfield (SPR024)
> Rachel R. Friedman (FRI045)
>
> BURR & FORMAN LLP
> 420 North 20th Street, Suite 3400
> Birmingham, AL  35203
> Telephone: (205) 251-3000
> Facsimile: (205) 458-5100
> gburge@burr.com
> fspringf@burr.com
> rfriedman@burr.com
>
> Attorneys for Defendants
> SANTANDER CONSUMER USA INC.,
> ALLSTAR RECOVERY, LLC, AND
> PATRICK K. WILLIS COMPANY D/B/A
> AMERICAN RECOVERY SERVICES

36

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document has been served on the following by Notice of Electronic Filing on this the 10th day of November, 2017:

John C. Hubbard
P.O. Box 953
Birmingham, AL 35203
jch@jchubbardlaw.com

W. Whitney Seals
Pate & Cochrun LLP
P.O. Box 10448
Birmingham, AL 35202
whitney@plc-law.com

*s/ Rachel R. Friedman*
OF COUNSEL

37